### UNITED STATES of America

### v.

### Roy William HARRIS a/k/a "Will Harris," Defendant.

### No. 92 CR. 455(CSH).

United States District Court,
S.D. New York.

July 26, 1999.

Mary Jo White, U.S. Atty., Southern District of New York, New York City (Gary Stein, Asst. U.S. Atty., of counsel).

Lewis & Fiore, New York City, for Defendant Roy William Harris,

Gerald B. Lefcourt, P.C., New York City, for Susan Harris.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

The Court of Appeals remanded this criminal case to this Court for reconsideration of the order of restitution that formed a part of the original sentence. *United States v. Harris*, 79 F.3d 223, 232–33 (2d Cir.1996). Following a hearing and the submission of legal authorities, this Court enters today an amended judgment of conviction and sentence. The purpose of this opinion is to explain the Court's resolution of the reinstatement issue.

### I. *Background*

Familiarity is assumed with the Court of Appeals' opinion and all prior opinions of this Court in the case. The facts are recited only to the extent necessary to explain the restitution issue and its resolution.

Prior to his indictment on the charges underlying this case, defendant Roy William Harris was the president, chief executive officer, and majority shareholder of Arochem Corporation ("Arochem") and Arochem International, Inc. ("International") (together the "Arochem Companies"). International operated a petroleum and petrochemical refinery in Puerto Rico. Arochem, based in Greenwich, Connecticut, traded in petroleum and petroleum products and provided management services to International.

In January 1990, a consortium of banks led by Chase Manhattan Bank, N.A.

("Chase") entered into a revolving credit agreement with the Arochem Companies. The other members of the consortium were Bank Brussels Lambert, Swiss Bank Corp., Bank Indosuez, and Skopbank (hereinafter collectively, including Chase, "the Banks"). The underlying indictment arose out of Harris's fraudulent diversion of funds borrowed from the Banks to fund trading activities of a sort prohibited by the loan instruments. A jury convicted Harris on numerous counts of wire and bank fraud, money laundering, conducting a continuing financial crimes enterprise, and related charges. After denying various defense motions at the post-verdict and sentencing stages, this Court sentenced Harris to a 188–month term of imprisonment, a five-year term of supervised release, and special assessments totalling $1,100. I also ordered Harris to pay $200 million in restitution to the Banks.

Specifically, the original judgment directed Harris to make restitution in the amount of $200 million to the five lending Banks "as the interests of these banks may appear," to be paid through the Probation Department and "in installments according to a schedule of payments set forth by the Probation Department." On direct appeal, in the opinion reported at 79 F.3d 223, the Court of Appeals affirmed Harris's conviction and all aspects of his sentence except for the order of restitution.[1] As to restitution, the Court of Appeals quoted the provision in the Victim Witness Protection Act of 1983 ("VWPA"), 18 U.S.C. § 3664(a), which requires that a district court fashioning an order of restitution must "consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 79 F.3d at 232. The Court of Appeals remanded

the restitution issue to this Court for re-sentencing because the record "must show that the [district] court has considered [the statutory] factors in ordering restitution," *id.* at 233 (citation and internal quotation marks omitted), and in this case "the record does not indicate that the district court considered the financial needs and earning ability of the defendant and [his] dependents." *Id.* This Court is instructed on remand "to consider all of the relevant factors in making its determination of restitution." *Id.*

The Court of Appeals also held that this Court had erred "in delegating its responsibility for setting a payment schedule to the probation department," citing *United States v. Porter,* 41 F.3d 68, 71 (2d Cir. 1994) (*"Porter I"*), for the proposition that a "sentencing court cannot authoriz[e] a probation officer to make post-sentencing decisions as to either the amount or the scheduling of installment payments." 79 F.3d at 232 n. 6 (internal quotation marks omitted).

For reasons that will become apparent, it is pertinent to this opinion to note that immediately following the jury verdict, returned on December 14, 1992, Harris consented to the order of forfeiture for which the government had prayed in the indictment. The statutory forfeiture provisions are found in 21 U.S.C. § 853, made applicable to the case at bar by 18 U.S.C. § 982(b)(1). The most economically significant property subject to forfeiture was a residence located at 10 Flagler Drive, Greenwich, Connecticut ("the Flagler Drive Property"). Harris's interests in the Flagler Drive Property and any proceeds of its sale were forfeited to the government by a Consent Order of Forfeiture entered into on December 14, 1992. The property was sold in May 1994 and the proceeds, $2,746,279.24, were paid into the interest-bearing United States Mar-

1. This Court subsequently denied Harris's motion for habeas corpus relief. *See Harris v. United States,* 9 F.Supp.2d 246 (S.D.N.Y. 1998), *appeal docketed,* No. 98–2594 (2d Cir. July 2, 1998).

shals Service's Seized Asset Deposit Account where they remain, after interest, with a total of approximately $3.5 million. *See* Letter dated June 17, 1999, from AUSA Gary Stein ("Stein Letter"), at 1.

The forfeiture statute permits third parties to claim legal interests in forfeited funds superior to that of the convicted defendant. 21 U.S.C. § 853(n). The district court adjudicates the validity of third party claims and amends the order of forfeiture in accordance with its determinations. § 853(n)(6).

In the case at bar, third party claims have been asserted against the proceeds of the Flagler Drive Property by Susan Harris, the defendant's former wife; by the Banks; and by the Bankruptcy Trustee of the Arochem Companies, which are the subject of a bankruptcy proceeding in the District of Connecticut.

For reasons that will become apparent, it is necessary to consider the circumstances of Susan Harris in greater detail. What follows on that subject is based upon the verified claim dated December 4, 1998, Susan Harris has submitted through counsel in the forfeiture proceeding, together with certain exhibits. I hereby adopt that claim as part of the record on these resentencing proceedings.

It appears that Susan and Roy William Harris were married on January 8, 1977. Two children were born of the marriage: daughters presently aged seventeen and thirteen. Susan Harris and defendant permanently separated in or about May 1990. In February 1991, Susan Harris brought an action in the Superior Court of Connecticut at Stamford for dissolution of the marriage. Petition of Susan Harris ("the Petition") at ¶¶ 2, 3.

After extended negotiations, the Harrises entered into a written Separation Agreement dated November 27, 1991. Petition, Ex. 1. On December 5, 1991, the Connecticut court (Novack, *J.*) entered a judgment dissolving the marriage and incorporating by reference the November 27, 1991 Separation Agreement. Petition, ¶¶ 4, 5.

The Separation Agreement provided that "[t]he parties shall at all times live and continue to live separate and apart for the rest of their natural lives." Art. I, ¶ 1.1. In consideration of the undertakings set forth in the Separation Agreement, each of the Harrises waived any claim for past, present or future alimony against the other, and each agreed to "release and acquit the other party and his or her estate of and from any and all claims, liabilities, and obligations whatsoever past, present and future, actual or potential, whether arising from their relationship as Husband and Wife or otherwise." Art. II, ¶ 2.1

The Separation Agreement imposed a number of obligations upon defendant. Specifically, defendant agreed to pay as child support reasonable expenses for the children's education, entertainment, medical needs, transportation, and clothing. Art. II, ¶ 2.4. Defendant's obligations under that paragraph terminate "with respect to each child of the parties when she attains the age of eighteen (18) years, dies or is emancipated, whichever first occurs." *Id.* However, Art. VI of the Separation Agreement also obligated defendant to pay the expenses of the children's private primary and secondary schooling and their undergraduate college educations.

Art. IV of the Separation Agreement dealt with the "Division of Property." Its more significant provisions recited that Susan Harris was the sole owner of the residence she was then occupying with the children, located at 8 Woodside Road, Greenwich, Connecticut. That property was encumbered by a first mortgage to Citibank, with an approximate balance of $364,000; defendant was obligated, within six months of the execution of the Separation Agreement, to "pay the entirety of the balance of principal and interest owing with respect to said mortgage." Art. IV, ¶ 4.1. Defendant retained sole possession of the Flagler Drive Property. Art. IV,

¶ 4.2. Lastly, defendant promised to pay Susan Harris, not later than March 31, 1992, the cash amount of $1,250,000. Art. IV, ¶ 4.3.

In December 1991, defendant advised Susan Harris that he would be unable to comply with the payment schedule contained in the Separation Agreement. He requested additional time to pay the $1,250,000 required by ¶ 4.3. Susan Harris agreed to an extension of time, in consideration of defendant conveying to her a mortgage on the Flagler Drive Property in the amount of $1,850,000. That amount was intended to secure the defendant's obligations to pay the outstanding mortgage on Susan Harris's Woodside Road property; pay her the $1,250,000 lump sum; and pay $15,000 Susan Harris incurred in legal fees during the divorce action. These additional obligations were recited in a Stipulation Regarding Modification of Judgment and Amendment of Separation Agreement dated January 2, 1992, together with an extension of defendant's time to make the $1,250,000 payment to and including April 30, 1992. Petition, Ex: 2. Defendant conveyed the Flagler Drive Property mortgage to Susan Harris on January 2, 1992. She recorded it in the Town of Greenwich Land Records on January 3, 1992. Petition, Ex. 3.

In point of fact, defendant has never paid to Susan Harris any of the amounts called for by the Separation Agreement and its Modification.

Susan Harris's claim in the forfeiture proceeding is for $1,698,755.95, plus interest, costs, and attorney's fees and expenses. That particular amount is based on the $1,850,000 mortgage she holds on the Flagler Drive Property, less $151,-244.05 derived from the sale of other items of defendant's property, which amount Susan Harris received over and above expenses and mortgage payments defendant was obligated to make under the Separation Agreement. Petition, ¶ 18, 19.

Susan Harris had stopped working outside the home when her first child was born, more than sixteen years go. In January 1993 she obtained a license to sell real estate, and has been working on a commission basis since that time. "She also draws on savings and interest income to provide for her daughters." Petition, ¶ 21.

The entry of a final order in the forfeiture proceeding has been delayed by settlement negotiations involving the third-party claimants and the government. I am now advised by the government that the government, Susan Harris, the Banks, and the Arochem Bankruptcy Trustee "have reached an agreement to settle the forfeiture proceeding." Stein Letter at 2. That letter continues:

> The settlement contemplates a payment of slightly more than $1 million to Susan Harris on her claim, which is based on a mortgage she held on the Flagler Drive Property. The settlement further contemplates that the remaining funds (the "Remaining Funds") would be paid to or on behalf of the Banks as victims of defendant's crimes, with some of the funds going to the Arochem Trustee pursuant to agreements between the Trustee and the Banks. The settlement agreement is also predicated upon the simultaneous distribution of the funds to the affected parties.

The government declares its willingness "to relinquish its own interest in the funds in favor of the Banks as victims of the defendant's fraud, but needs to have a proper legal basis for recognizing the Banks as appropriate victims to receive the funds." *Id.* One would have though than an ample basis for doing so already existed; but the government perceives a further need, and suggests that the need would be satisfied "[i]f the Banks are named as beneficiaries of a restitution order, and restitution is ordered in an amount at least equal to the amount of the Remaining Funds." Such provisions, the government concludes, "would provide the

requisite legal basis" for the government, in the most expeditious fashion, to implement the agreed-upon distribution of the funds currently held in the Marshals' account. *Id.*[2]

Of course, the government's suggestion poses no difficulties; this Court's original order of restitution specifically identified the Banks as victims of Harris's fraud, and set the restitution amount at $200 million. Nothing in the Court of Appeals' opinion generating this remand is critical of either of those conclusions.

The Court held a hearing on June 23, 1999 to consider all the issues arising out of the remand. The defendant was present, represented by counsel. Counsel for the government was present. Susan Harris was present, represented by counsel, whose comments I invited because, in the circumstances discussed above, Susan Harris clearly had standing to be heard. Some neatly clad onlookers also attended, and while I suspect they represented some or all of the Banks, they did not ask to appear on the record, and stood (or sat) mute. After the hearing, the Court has received additional written submissions.

Having reflected upon the Court of Appeals' opinion, considered the oral and written submissions of counsel, and conducted some research of my own, I am now prepared to enter an amended judgment and order of restitution. The reasons for its provisions are stated in Part II.

**2.** Susan Harris, in particular, stresses her need for a release of funds as quickly as possible.

**3.** *See* Transcript of June 23, 1999 hearing at 45, where counsel for defendant stated:
  Mr. Harris is willing to waive the formal pronunciation [*sic*] of the sentence and take it as a decision of the court in an amended judgment and we are willing to waive that in order to make sure he gets back to his place at Fort Dix.

**4.** Rule 43(b) provides:
  The further progress of the trial to and including the return of the verdict, and the imposition of sentence, will not be prevented and the defendant will be considered to

## II. *Discussion*

### A. *Legality of an Amended Sentence Imposed in Defendant's Absence*

There is a threshold question to consider. The defendant will not be present when the Court announces his amended sentence. Rather, that sentence will take the form of documents (the judgment and this opinion) which will be filed with the Clerk and mailed to counsel. Defendant does not insist upon being present for a resentencing in open Court. On the contrary: defendant is anxious that the present place of his incarceration not be disturbed, and, to that end, his counsel has explicitly waived defendant's presence at a resentencing.[3]

But I conceive it to be my duty to consider *sua sponte* whether the rules of criminal procedure require defendant to be present, notwithstanding his waiver. I conclude that they do not.

The pertinent provisions are found in Rule 43(a), Fed. R.Crim. P., which says that "[t]he defendant shall be present ... at every stage of the trial including the impanelling of the jury and the return of the verdict, *and at the imposition of sentence*, except as otherwise provided by this rule." (emphasis added). Rule 43(b), set out in the margin, provides for circumstances in which a defendant's presence is excused, none of which is pertinent to the question at hand.[4] It might appear, there-

have waived the right to be present whenever a defendant, initially present at trial, or having pleaded guilty or nolo contendere,
  (1) is voluntarily absent after the trial has commenced (whether or not the defendant has been informed by the court of the obligation to remain during the trial),
  (2) in a noncapital case, is voluntarily absent at the imposition of sentence, or
  (3) after being warned by the court that disruptive conduct will cause the removal of the defendant from the courtroom, persists in conduct which is such as to justify exclusion from the courtroom.
  As the Advisory Committee notes state, "[t]he changes in subdivision (b) [which consisted principally of the addition of sub-

fore, that a defendant's presence at the "imposition of sentence" (and by logical extension at the imposition of an amended sentence) is mandatory and cannot be waived. But case law points to a different conclusion.

Second Circuit cases hold generally that "[d]espite the constitutional and statutory dimensions of a defendant's right to be present, the right may be waived." *United States v. Fontanez*, 878 F.2d 33, 35 (2d Cir.1989). To accept a waiver, the district court must determine that the defended knowingly and voluntarily gave it, and that there was a controlling public interest in continuing the trial in the defendant's absence. *Id.* If the court errs in continuing the trial in the defendant's absence, the inquiry on appeal is "whether that error was harmless error." *Id.* at 36. *See also Polizzi v. United States*, 926 F.2d 1311, 1319 (2d Cir.1991), declaring the same general principles. While these cases did not involve sentencing, *United States v. Doe*, 964 F.2d 157 (2d Cir.1992), considered a defendant's waiver of his right to be present in the context of a sentencing proceeding; the Second Circuit held in *Doe* that a defendant, who had cooperated with the government, could validly waive his right to be present at a chambers conference convened to discuss that cooperation immediately before sentencing.

Other circuits have squarely held that a defendant may waive his presence in court during the actual sentencing. *See United States v. Sealander*, 91 F.3d 160, 1996 WL 408368, at *15 (10th Cir.1996),[5] (defendant "knowingly and voluntarily waived his right to be present during the sentencing hearing" when he said to the Marshal "would you mind getting me out of here," and to the trial judge "I don't want to

listen to any more of your crap, judge"); *United States v. Ammar*, 919 F.2d 13, 17 (3rd Cir.1990) (district court could properly resentence defendant *in absentia* where defendant-petitioner suggested in correspondence to court of appeals that "he is reluctant to travel from Florida where he is currently working and participating in a rational behavior training program, a weekly counselor interview, and regular urine testing. That decision is up to the petitioner.") (internal quotation marks omitted). *See also United States v. Marmolejos*, No. 90–442–2, 1998 WL 355503, at *1 (E.D.Pa. June 18, 1998) ("Defendant has expressly waived his right to be present at his re-sentencing. See affidavit of Freddie Marmolejos. Defendant's waiver is found to be knowingly and voluntarily made, and sufficient to allow sentencing *in absentia.*"); *cf. United States v. Metro Container Corp.*, No. 90–359, 1992 WL 150656, at *1 (E.D.Pa. June 17, 1992) (district court denied motion by government for entry of judgment against corporate defendants; "[t]he government states that defendant Maslow, apparently on behalf of the Metro companies, waives a sentencing proceeding. While these defendants may knowingly and intelligently waive their right to be present for imposition of sentence, no affidavit is presented and no waiver proceeding is requested.").

In the case at bar, I am satisfied that Harris knowingly and voluntarily waived his right to be present at this Court's imposition of an amended sentence. After conferring with Harris, his attorney, David Lewis, stated that Harris preferred to be remanded and not be brought back to Court again. Harris was sitting next to his counsel when counsel said that. *See Doe*, 964 F.2d at 159 ("We have previously

paragraph (2)] are intended to remedy the situation where a defendant voluntarily flees before sentence is imposed. Without the amendment, it is doubtful that a court could sentence a defendant who had been present during the entire trial but flees before sentencing." That is not the situation presented by the case at bar.

**5.** Although *Sealander* is an unpublished opinion, the Tenth Circuit allows such opinions to be cited in other cases "if the opinion has persuasive value on a material issue ..." *See* prefatory note to the text of the opinion appearing at 1996 WL 408368.

held that a waiver by counsel of a defendant's right to be present during the proceedings is valid when made in the presence of the defendant") (citing *Polizzi*, 926 F.2d at 1322–23). I can discern no controlling public interest-requiring Harris to be returned to court for the resentencing; on the contrary, transporting defendant from his present place of incarceration, contrary to defendant's own wishes, would achieve no public purpose and would needlessly consume the resources of the Marshals Service.

For the foregoing reasons, I will impose an amended sentence upon Harris without requiring him to be present at its announcement.

### B. *The Statutory Scheme for Orders of Restitution*

When the Second Circuit decided Harris's direct appeal, on February 28, 1996, the VWPA governed orders of restitution. Subsequently Congress amended the statute by enacting the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. §§ 3663–3664, which "applies, to the event constitutionally permissible, in cases where the defendant is convicted on or after April 24, 1996." *Kinlock,* 174 F.3d 297, 300 n. 2 (2d Cir.1999). That date is material to whether "an application of MVRA would violate the Ex Post Facto Clause" as to a particular defendant. *Id.* Harris was convicted in 1992.

Under the VWPA the making of an order of restitution lay in the district court's discretion. *See* § 3663(a)(1) ("the court ... may order, in addition to ... any other penalty authorized bylaw, that the defendant make restitution to any victim of such offense."). The factors the Court of Appeals commanded me on remand to take into account and articulate in exercising that discretion appeared in the VWPA in 18 U.S.C. § 3664(a), under the caption "Procedure for issuing order of restitu-

tion." § 3664 of the VWPA followed § 3663, captioned "Order of restitution." The MVRA recites comparable considerations at § 3663(B)(i)-(I-II).[6] Although there are grammatical differences, in this regard the substance of the statutes are the same. *See United States v. Kinlock,* 174 F.3d at 300 n. 2 ("[A]ppellant admits that even if the MRVA applies, the factors which the district court must consider when ordering restitution are substantially similar to those outlined in its predecessor, 18 U.S.C. § 3664(a). Because we find the factors are the same in either case, we need not reach the question of whether MRVA applies in this case."). *Id.*

MRVA adds § 3663A, which makes an order of restitution mandatory for convictions of certain crimes, among them "an offense against property under this title, including any offense committed by fraud or deceit ..." § 3663A(c)(1)(A)(ii). Harris's conviction falls within that category. Given the date of his conviction, the Ex Post Facto Clause would preclude an application to him of the more strict mandatory nature of a restitution order. But that consideration has no practical effect, since I had already exercised my discretion to impose an order of restitution; while my implementation was imperfect in practice, nothing has arisen which would alter that decision in principle.

But the Ex Post Facto Clause does operate to preclude the application of one MVRA provision to Harris. The VWPA limited the time within which restitution installment payments may be required to "five years after the term of imprisonment imposed, if the court does not order probation," VWPA § 3663(f)(2)(B), although the government and a victim named in the restitution order could thereafter enforce the order "in the same manner as a judgment in a civil action," § 3663(h)(1)(B), (2). The MVRA contains no time limitation on the "partial payments at specified inter-

---

6. For reasons that are not apparent, in the MVRA Congress relocated these provisions from § 3664 in the VWPA to § 3663 in the MVRA, although the captions of the two sections remain substantially the same.

vals" the court may order a defendant to pay, *see* MVRA § 3664(f)(3)(A), and so is more onerous to a defendant than the installment payment provisions of the VWPA.[7] Accordingly I will follow the VWPA in this regard.

The MVRA also contains a provision not found in the VWPA which appears to operate not to the defendant's detriment, but to his dependents' advantage. In those circumstances the Ex Post Facto Clause is not an impediment; and counsel for Susan Harris relied upon this new language during the hearing. The new provision in question appears in MVRA § 3664(f)(2), which states that "[u]pon determination of the amount of restitution owed to each victim," the court shall "specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of ---

(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

(B) projected earnings and other income of the defendant; and

(C) any financial obligations of the defendant; *including obligations to dependents.*"

(emphasis added).

Counsel for Susan Harris (and by extension for the couple's two minor children) contends that the defendant's unpaid obligations to them under the Separation Agreement must be factored into any order of restitution. I agree. While both the VWPA, § 3664(a), and the MVRA, § 3663(B)(i)(II), identify the "financial *needs* and earning ability ... of the defendant's dependents" (emphasis added) as factors the court must consider in determining whether to order restitution, the VWPA has *no counterpart* to the MVRA's direction that in structuring the schedule of restitution payments, the court must consider, *inter alia,* the defendant's "*obli-*

*gations* to dependents." But I think it is an appropriate and sensible construction of these statutes to conclude, as I do, that the "financial needs" of a defendant's dependents may be defined (that is, both quantified and limited) by a defendant's financial "obligations" to his dependents (or, in the case of a divorced wife, a former dependent) created by an arms-length compact such as the Separation Agreement in the case at bar.

Accordingly, in factoring the needs of Susan Harris and the minor children into the restitution order, I will look to the Separation Agreement and defendants' defaults thereunder as the determinative measure.

### C. *The Restitution Order to be Entered in this Case*

■ This Court's initial restitution order identified the five Banks as the victims and fixed the restitution amount payable to the Banks at $200 million "as the interests of these banks may appear." The purpose of that phrase is to divide any restitution payments among the Banks in proportion to their contributions to the group's loans to the Arochem Companies. The restitution amount was derived from the trial record. No party has questioned it, at the original sentencing, on appeal, or at resentencing. I will adhere to that amount and the manner of distribution of any payments.

There is no suggestion in the record or elsewhere that defendant Harris has the present ability to pay such a sum. On the contrary, the record reflects his indigence. As I am entitled to do, *see Kinlock,* 174 F.3d at 300, I adopt and consider the finding of the 1993 Pre–Sentence Report that "[i]t appears that the defendant would be unable to satisfy both a fine and restitution at this time". PSR at ¶ 177 p. 26. In order to present his habeas corpus peti-

---

7. Like the earlier statute, the MVRA contains provisions enabling the government and a named victim to enforce an order of restitu-  tion by other legal means. *See* MVRA § 3664(m).

tion, Harris submitted an affidavit of indigence to qualify for the appointment of counsel under the Criminal Justice Act. This affidavit, dated June 18, 1998, affirms that Harris has no assets or income. At the resentencing hearing on June 23, 1999, counsel for Harris represented that Harris was entirely without assets. Tr. 44–45. The government forfeited much of Harris's property, including what was apparently his most valuable asset, the Flagler Drive Property. While on occasion the government has suggested the possibility that Harris secreted vast sums off-shore, Harris has always denied that, and the government has never offered any proof to the contrary. The trial proof revealed Harris to be a quintessential hedonist, enjoying to the hilt the good life *in this country* until his fraudulent scheme collapsed; the government's formidable investigatory resources turned up no evidence that Harris was squirreling away any assets *abroad.* Harris faces many more years in prison, during which he cannot earn any sums of material amount; and when he is freed, the nature of the crimes of conviction render problematical his future employment in areas where he has experience. Recognizing that in restitution proceedings the defendant "ha[s] the burden of establishing [his] financial condition and the needs of [his] dependents by a preponderance of the evidence," *United States v. Porter,* 90 F.3d 64, 68 (2d Cir.1996) (*"Porter II"*), I conclude that on this record Harris has demonstrated his present indigence.

As to Harris's dependents, I am concerned with the situations of Susan Harris and the two minor children of the Harris marriage, now dissolved.[8] This is an atypical case, in that the defendant's obligations to such individuals (and conversely

their needs and entitlements) are spelled out with precision in a legal document (the Separation Agreement); they need not be derived from general principles. Thus in the Separation Agreement Susan Harris renounced any claim for future alimony; she settled for Harris's obligations to pay off the mortgage on her Woodside Road house and to pay her $1,250,000 in cash. The Agreement also obligated Harris to support each child until she reached age 18 or became emancipated, but not thereafter; and to pay for each child's education through undergraduate college, but not at graduate schools.

Harris has met none of these obligations. I am told that Susan Harris will receive "slightly more than $1 million" under the settlement of the several claims upon the proceeds of the sale of the Flagler Drive Property. Presumably that amount will not satisfy defendant's lump-sum cash obligation under the Settlement Agreement, particularly when one factors in interest and the fees of Susan Harris's energetic and able counsel. Susan Harris remains unpaid for the Woodside Road property mortgage, and for the support and schooling expenses she has incurred for the children, amounts that will only increase over time. The record does not permit a precise quantification of those amounts, particularly given the inability of college administrators (which I may judicially notice) to hold the line on tuition and costs. It is sufficient for present purposes to say that defendant's obligations to Susan Harris and the children must by now be very considerable, and they increase with every passing day.

I must also consider the dependents' earning abilities.[9] This is not a factor with

8. While on direct appeal Harris claimed that "prior to his incarceration, he was providing for his two daughters, ages eight and twelve, his ex-wife, mother, and two sisters," 79 F.3d at 233, he has presented no evidence with respect to the present circumstances of his mother and sisters, their present financial needs and earning abilities. At the resentencing hearing on June 23, 1999, all parties were

asked if they saw the need for a further evidentiary hearing. All responded in the negative. Tr. 43–45. Therefore, in the restitution context I am not in a position to consider defendant's mother and sisters.

9. For the purposes of a restitution order I continue to regard Susan Harris as a "dependent" of the defendant, although in the Sepa-

respect to the children, neither of whom is presently of college age. As for Susan Harris, I am told that she is presently employed on a commission basis as a real estate broker. No evidence of her actual income in that capacity was offered or demanded at the resentencing hearing. I can judicially notice that in the present market for homes in Fairfield County, Connecticut and environs, a successful broker stands to make a considerable commission on a particular sale. But I can also judicially notice that the real estate brokerage business is fiercely competitive, and that a significant number of competitors are cutthroats: genteel, to be sure, but cutthroats nonetheless, particularly where the supply of expensive homes is small and the demand, fueled by the newly affluent, is great. In real estate brokerage, a single fat commission may be preceded or followed by many lean months. In short, it would be unjust to discount materially Susan Harris's entitlements under the Separation Agreement on the basis of her present employment as a real estate broker.

In this totality of circumstances, I will enter an order of restitution as described below.

It would be an abuse of discretion to order Harris, an indigent defendant, to pay full restitution immediately. *United States v. Mortimer*, 52 F.3d 429, 436 (2d Cir.1995). "Nevertheless, a defendant's present financial situation does not eviscerate the district court's discretion to order restitution." *Kinlock*, 174 F.3d at 300. That is because, the Second Circuit has reasoned, "if full restitution is not ordered at the time of sentencing, an indigent defendant would evade the statutory purpose of making the victim whole in the event he should subsequently come-into sufficient funds." *Id.* (citing and quoting *United States v. Atkinson*, 788 F.2d 900, 904 (2d Cir.1986)). Accordingly, "because the court must order restitution at the time of sentencing and the defendant is under a continuing obligation to pay restitution as funds become available, the restitution order must contain a repayment schedule for the terms of both incarceration and supervised release." *Kinlock*, 174 F.3d at 300.[10]

It is possible to detect a controversy within the Second Circuit as to whether full restitution should be imposed "despite a finding that the defendant lacks present means to make full restitution and has such bleak prospects for future earnings that full restitution over a five-year term is completely unrealistic." *Porter II*, 90 F.3d at 69. While *Atkinson*, 788 F.2d at 904, held that full restitution may be ordered even though "there may be little chance that it will ever be made," Circuit Judge Winter (as he then was), concurring in *Porter I*, 41 F.3d at 72, 73, expressed the views that imposing a large restitution amount upon an impecunious defendant was "flatly inconsistent" with Congressional intent, and that *Atkinson* "did not authorize amounts that cannot be paid without Hollywood miracles." *Porter II*, at 90 F.3d at 69, also notes a comparable disagreement between other circuits; the Tenth Circuit, seemingly placing itself within Judge Winter's camp, said in *United States v. Rogat*, 924 F.2d 983, 985 (10th Cir.1991), that "we will not put the court in the lottery business." [11]

ration Agreement she and Harris agreed to dissolve their marriage entirely and go their separate and independent ways. Given Harris's unsatisfied obligations to his former wife arising out of that Agreement, it would exalt form over substance to deprive her of the status of "dependent" in the restitution context. Susan Harris is entitled to "depend" upon defendant satisfying his financial obligations to her, assuming his future financial ability to do so (however remote that possibility may be). Of course, no such questions arise with the children's continuing status as "dependents."

10. As *Kinlock* also holds, the district court may not delegate its authority to schedule restitution payments to the Bureau of Prisons or the Probation Department. *Id.*

11. To the extent that a district court judge may be permitted to enter the debate, I find the Tenth Circuit's reticence in *Rogat* distinctly odd. The court of appeals seems to visual-

Whatever controversies may arise out of other decisions, I think it clear that a $200 million restitution order lies within my discretion, notwithstanding Harris's present indigence. In the first place, the Second Circuit did not take issue with that amount on direct appeal, only noting instead that "the district court properly was concerned about granting a small amount of restitution and then, due to double jeopardy, being barred from increasing the amount if Harris' financial situation subsequently improved." 79 F.3d at 233. Second, while it must be acknowledged that the restitution amount in *Kinlock* was much smaller, the Second Circuit's rationale in that very recent opinion seems to me to comedown on the side of a restitution order in the full amount, notwithstanding high odds against full payment.

Therefore I will follow *Kinlock* and structure a repayment schedule for the terms of both incarceration and the five years of supervised release. Under the VWPA, the repayment schedule may not extend beyond those five years. *See United States v. Giwah*, 84 F.3d 109, 115 (2d Cir.1996) ("The district court may only order a schedule of restitution payments during the five years following the conclusion of Giwah's prison term. 18 U.S.C. § 3663(f)(2)(B)."); *United States v. Fuentes*, 107 F.3d 1515, 1533 (11th Cir. 1997) (same).

Specifically, during his incarceration, Harris will be directed to pay towards restitution $35 per month or 10% of his gross income, whichever is greater. The Bureau of Prisons or the Probation Department, as the Department of Justice may prefer, will be directed to collect and hold these funds in an interest-bearing account pending the Court's further order. I assume that his available prison earnings will enable Harris to make the $35 pay-

ments. If they do not, Harris may apply to this Court on a sufficient factual showing for a reduction.

During his supervised release, Harris will be directed to pay towards restitution $100 per month or 10% of his gross income, whichever is greater.

I limit defendant's restitution payments to these amounts and to these percentages in order that some amounts may be or become available to meet defendant's obligations to his dependants and to meet the defendant's own needs.

The Probation Department will be directed to collect and hold these funds in an interest-bearing account pending the Court's further order. The Banks may from time to time ask the Court for a statement of the present balances in these accounts.

The total amount Harris is directed to pay in restitution to the Banks will be reduced by any amount the Banks receive from the forfeited Flagler Drive Property proceeds.

The restitution order will also provide that if, during his incarceration or supervised release, Harris receives funds from any source in an amount sufficient to pay restitution in full, after satisfaction of his obligations to his dependents as defined in the Separation Agreement discussed in this Opinion, he will be directed to do so. To that end, Harris will be directed to give prompt notice to the Probation Department of any additional funds or-assets he may receive during the pendency of the restitution order.

An amended judgment containing an amended restitution order consistent with this Opinion is being filed concurrently herewith.

ize an incarcerated defendant winning millions in a lottery. Providing for such an eventuality in a restitution order does not put the sentencing court "in the lottery business"; the lottery business is conducted by the States of the Union that run lotteries to raise reve-

nues. The Tenth Circuit's Puritan attitude would permit the lucky defendant to keep his winnings and require his victims, who might otherwise be made whole, to remain uncompensated. It is difficult to imagine a public policy justifying such a result.

In view of the entry of the amended judgment and restitution order, the parties to the forfeiture proceeding are directed to proceed forthwith with the implementation of the settlement agreement between them.

The foregoing is so ordered.