Justice SOTOMAYOR, dissenting.
This Court has long recognized the grave "physiological, emotional, and mental" injuries suffered by victims of child pornography. New York v. Ferber, 458 U.S. 747, 758, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). The traffic in images depicting a child's sexual abuse, we have observed, " 'poses an even greater threat to the child victim than does sexual abuse or prostitution' " because the victim must " 'go through life knowing that the recording is circulating within the mass distribution system for child pornography.' " Id ., at 759, n. 10, 102 S.Ct. 3348. As we emphasized in a later case, the images cause "continuing harm by haunting the chil[d] in years to come." Osborne v. Ohio, 495 U.S. 103, 111, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990).
Congress enacted 18 U.S.C. § 2259 against this backdrop. The statute imposes a "mandatory" duty on courts to order restitution to victims of federal offenses involving the sexual abuse of children, including the possession of child pornography. § 2259(b)(4). And it commands that for any such offense, a court "shall direct the defendant to pay the victim ... the full amount of the victim's losses." § 2259(b)(1).
The Court interprets this statute to require restitution in a "circumscribed" amount less than the "entirety of the victim's ... losses," a total it instructs courts to estimate based on the defendant's "relative role" in the victim's harm. Ante, at 1727. That amount, the Court holds, should be neither "nominal" nor "severe." Ibid .
I appreciate the Court's effort to achieve what it perceives to be a just result. It declines to require restitution for a victim's full losses, a result that might seem incongruent to an individual possessor's partial role in a harm in which *473 countless others have participated. And it rejects the position advanced by Paroline and the dissenting opinion of THE CHIEF JUSTICE, which would result in no restitution in cases like this for the perverse reason that a child has been victimized by too many.
The Court's approach, however, cannot be reconciled with the law that Congress enacted. Congress mandated restitution for the "full amount of the victim's losses," § 2259(b)(1), and did so within the framework of settled tort law principles that treat defendants like Paroline jointly and severally liable for the indivisible consequences of their intentional, concerted conduct. And to the extent an award for the full amount of a victim's losses may lead to fears of unfair treatment for particular defendants, Congress provided a mechanism to accommodate those concerns: Courts are to order "partial payments" on a periodic schedule if the defendant's financial circumstances or other "interest [s] of justice" so require. §§ 3664(f)(3), 3572(d)(1). I would accordingly affirm the Fifth Circuit's holding that the District Court "must enter a restitution order reflecting the 'full amount of [Amy's] losses,' " In re Amy Unknown, 701 F.3d 749, 774 (2012), and instruct the court to consider a periodic payment schedule on remand.
I
A
There are two distinct but related questions in this case: First, whether Paroline's *1736 conduct bears a sufficient causal nexus to Amy's harm, and second, if such a nexus exists, how much restitution Paroline should be required to pay. Beginning with causation, I agree with the majority that proximate causation is beyond dispute because the medical and economic losses suffered by Amy are "direct and foreseeable results of child-pornography crimes." Ante, at 1722; accord, ante, at 1731 (ROBERTS, C.J., dissenting). The real issue, then, is "the proper standard of causation in fact." Ante, at 1722 (majority opinion). *474 The majority and I share common ground on much of this issue. We agree that the ordinary way to prove cause-in-fact is to show that a result would not have occurred "but for" the defendant's conduct. Burrage v. United States, 571 U.S. ----, ----, 134 S.Ct. 881, 887-888, 187 L.Ed.2d 715 (2014). We also agree that " 'strict but-for causality' " is " 'not always required,' " and that alternative standards of factual causation are appropriate "where there is 'textual or contextual' reason to conclude" as much. Ante, at 1722 - 1723, 1727 (quoting Burrage, 571 U.S., at ----, 134 S.Ct., at 888-889, 889-890). And most importantly, we agree that there are ample reasons to reject a strict but-for causality requirement in § 2259. See ante, at 1727.
Starting with the text, § 2259 declares that a court "shall order restitution for any offense under this chapter." The possession of child pornography, § 2252, is an offense under the relevant chapter, and the term "shall" creates "an obligation impervious to judicial discretion," Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). So the text could not be clearer: A court must order restitution against a person convicted of possessing child pornography. Section 2259(b)(4) underscores this directive by declaring that "[t]he issuance of a restitution order under this section is mandatory." And the statute's title-"mandatory restitution"-reinforces it further still.
Interpreting § 2259 to require but-for causality would flout these simple textual commands. That is because "a showing of but-for causation cannot be made" in this case and many like it. Ante, at 1722. Even without Paroline's offense, it is a regrettable fact that "thousands would have viewed and would in the future view [Amy's] images," such that "it cannot be shown that her trauma and attendant losses would have been any different but for Parolin[e]." Id., at 1723. A but-for requirement would thus make restitution under § 2259 the opposite of "mandatory"; it would preclude restitution to the victim of the typical child pornography offense for the nonsensical reason that the child has been victimized by too many.
*475 Such an approach would transform § 2259 into something unrecognizable to the Congress that wrote it. When Congress passed § 2259 in 1994, it was common knowledge that child pornography victims suffer harm at the hands of numerous offenders who possess their images in common, whether in print, film, or electronic form. See, e.g., Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 544 (1981) (describing the "enormous number of magazines" and "hundreds of films" produced each year depicting the sexual abuse of children, which were circulated to untold numbers of offenders through a "well-organized distribution system [that] ensures that even the small towns have access to [the] material"); Doyle, FBI Probing Child Porn on Computers, San Francisco Chronicle, Dec. 5, 1991, p. A23 (describing complaint that "child pornographic photographs" were circulating via the "America On-Line computer service"). Congress was also acutely aware of the *1737 severe injuries that victims of child pornography suffer at the hands of criminals who possess and view the recorded images of their sexual abuse. Congress found, for example, that the "continued existence" and circulation of child pornography images "causes the child victims of sexual abuse continuing harm by haunting those children in future years." Child Pornography Prevention Act of 1996, § 121, 110 Stat. 3009-26, Congressional Findings (2), notes following 18 U.S.C. § 2251 (hereinafter § 2251 Findings). It is inconceivable that Congress would have imposed a mandatory restitution obligation on the possessors who contribute to these "continuing harm[s]," ibid., only to direct courts to apply a but-for cause requirement that would prevent victims from actually obtaining any recovery.
There is, of course, an alternative standard for determining cause-in-fact that would be consistent with the text of § 2259 and the context in which it was enacted: aggregate causation. As the majority points out, aggregate causation was, "no less than the but-for test itself," a "part of the background *476 legal tradition against which Congress" legislated. Ante, at 1727. And under this standard, " '[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event.' " Ante, at 1723 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 268 (5th ed. 1984) (hereinafter Prosser and Keeton)).[1] Paroline and his fellow offenders plainly qualify as factual causes under this approach because Amy's losses would not have occurred but for their combined conduct, and because applying the but-for rule would excuse them all.
There is every reason to think Congress intended § 2259 to incorporate aggregate causation. Whereas a but-for requirement would set § 2259's "mandatory" restitution command on a collision course with itself, the aggregate causation standard follows directly from the statute. Section 2259 is unequivocal; it offers no safety-in-numbers exception for defendants who possess images of a child's abuse in common with other offenders. And the aggregate causation standard exists to avoid exactly that kind of exception. See Prosser and Keeton § 41, at 268-269 (aggregate causation applies where multiple defendants "bea[r] a like relationship" to a victim's injury, and where "[e]ach seeks to escape liability for a reason that, if recognized, would likewise protect each other defendant in the group, thus leaving the [victim] without a remedy in the face of the fact that had none of *477 them acted improperly the [victim] would not have suffered the harm"); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27, Comment f, p. 380 (2005) (similar).
At bottom, Congress did not intend § 2259 to create a safe harbor for those who inflict upon their victims the proverbial death by a thousand cuts. Given the very nature of the child pornography market-in which a large class of offenders *1738 contribute jointly to their victims' harm by trading in their images-a but-for causation requirement would swallow § 2259's "mandatory" restitution command, leaving victims with little hope of recovery. That is all the "textual [and] contextual" reason necessary to conclude that Congress incorporated aggregate causation into § 2259. Burrage, 571 U.S., at ----, 134 S.Ct., at 888-889.
B
The dissent of THE CHIEF JUSTICE suggests that a contrary conclusion is compelled by our decision in Hughey v. United States, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). Hughey involved a defendant who had been convicted of a single count of unauthorized credit card use, which resulted in $10,412 in losses. Id ., at 414, 110 S.Ct. 1979. The Government nonetheless requested restitution for additional losses based on different counts in the indictment that the Government had agreed to dismiss. Id ., at 413, 110 S.Ct. 1979. We declined the Government's request, reasoning that restitution was to be tied to the offense of conviction. Id., at 418, 110 S.Ct. 1979.
That commonsense holding, of course, casts no doubt on the ordinary practice of requiring restitution for losses caused by an offense for which a defendant is convicted, where the loss is the product of the combined conduct of multiple offenders. What troubles my colleagues in this case, then, is not the concept of restitution in cases involving losses caused by more than one offender. Their objection is instead to restitution in cases where the victim's losses are caused by too many offenders. As THE CHIEF JUSTICE
*478 puts it, Congress wrote a law that would enable Amy to recover if only her images had been circulated by "a single distributor" to just a "handful of possessors." Ante, at 1719 - 1720. But because she has been victimized by numerous distributors and thousands of possessors, she gets nothing. It goes without saying that Congress did not intend that result.
My colleagues in dissent next assert that no restitution may be awarded because of § 3664(e), which describes the Government's burden of showing the "loss sustained by a victim as a result of the offense." But that provision is nothing close to a "direct answer" to this case. Ante, at 1717 - 1718. It simply restates the question: What should a court do when the losses sustained by a victim are the "result of the [defendant's] offense," § 3664(e), but that result is produced in combination with the offenses of others? One answer is that the defendant's offense is a cause-in-fact only of losses for which it was a but-for cause. A second is that the offense is a cause-in-fact of losses for which it was part of the aggregate cause. The former would preclude restitution in cases like this; the latter would allow it. Given Congress' "mandatory" command that courts "shall order restitution for any offense," §§ 2259(a), (b)(4), it is beyond clear which answer Congress chose.[2]
*1739 THE CHIEF JUSTICE's dissent also fails to contend with the ramifications of the suggestion that § 3664(e) forecloses entry of restitution in cases where a victim suffers indivisible *479 losses as a result of the aggregate conduct of numerous offenders. It claims that this reading of § 3664(e)"will work just fine" for "common crimes" such as assault. Ante, at 1718 - 1719. But what about a victim of a vicious gang assault, where a single offender's conduct cannot be labeled a but-for cause of any discrete injury? Such offenses are, unfortunately, all too common. See, e.g., Wheelock v. United States, 2013 WL 2318145, *2 (E.D.Wisc., May 28, 2013) (defendant convicted for his participation in a gang rape of a 13-year-old victim in which he "and several other individuals had provided alcohol to the girl and, after she became intoxicated and unconscious, sexually assaulted her"); United States v. Homer B ., 1990 WL 79705 (C.A.9, June 14, 1990) (similar). I would have thought it beyond refute that the victim of such a tragic offense would be entitled to restitution even though none of her losses may be attributed solely to any individual defendant. If the opinion of THE CHIEF JUSTICE is in agreement, it does not explain why the result should be any different for victims like Amy, who have suffered heart wrenching losses at the hands of thousands of offenders rather than a few.[3]
II
The majority accepts aggregate causation at least to an extent, ruling that § 2259 requires possessors to pay some amount of restitution even though "it is impossible" to say *480 that they caused "a particular amount of [a victim's] losses ... by recourse to a more traditional [but-for] causal inquiry." Ante, at 1727. But the majority resists the "strict logic" of aggregate causation for fear that doing so would produce the "striking outcome" of an award against an individual possessor "for the entire aggregately caused amount." Ante, at 1724. The majority accordingly holds that "a court applying § 2259 should order restitution in an amount that comports with the defendant's relative" contribution to "the victim's general losses." Ante, at 1727.
The majority's apportionment approach appears to be a sensible one. It would, for instance, further the goal of "proportionality in sentencing," avoid "turning away victims emptyhanded," and "spread payment among" offenders. Ante, at 1728 - 1729. But it suffers from a far more fundamental problem: It contravenes the language Congress actually used. Section 2259 directs courts to enter restitution not for a "proportional" or "relative" amount, but for the "full amount of the victim's losses." § 2259(b)(1). That command is unequivocal, and it is buttressed by the tort law tradition of joint and several liability within which Congress legislated.
A
Once a defendant is found to bear a sufficient causal nexus to a victim's harm, *1740 § 2259 provides a straightforward instruction on how much restitution a court is to order: "The order of restitution under this section shall direct the defendant to pay the victim ... the full amount of the victim's losses." § 2259(b)(1). Because the word "shall" imposes a "discretionless obligatio[n]," Lopez v. Davis, 531 U.S. 230, 241, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001), a court considering a § 2259 restitution request has no license to deviate from the statute's command. It must enter an order for the "full amount of the victim's losses," regardless of whether other defendants may have contributed to the same victim's harm. *481 If there were any doubt on the matter, Congress eliminated it in § 2259(b)(4)(B)(ii), which bars a court from "declin[ing] to issue [a restitution] order under this section" on the ground that a victim "is entitled to receive compensation for his or her injuries from the proceeds of insurance or any other source." One "other source" from which a victim would be "entitled to receive compensation" is, of course, other offenders who possess images of her sexual abuse. It is unthinkable that Congress would have expressly forbidden courts to award victims no restitution because their harms have been aggregately caused by many offenders, only to permit restitution orders for a single penny for the same reason.
B
As the majority recognizes, Congress did not draft § 2259 in a vacuum; it did so in the context of settled tort law traditions. See ante, at 1723 - 1724; see also Meyer v. Holley, 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003) (Congress "legislates against a legal background of ordinary tort-related" principles). Section 2259 functions as a tort statute, one designed to ensure that victims will recover compensatory damages in an efficient manner concurrent with criminal proceedings. See Restatement of Torts § 901, p. 537 (1939) (the purposes of tort law include "to give compensation, indemnity, or restitution for harms" and "to punish wrongdoers"); Dolan v. United States, 560 U.S. 605, 612, 130 S.Ct. 2533, 177 L.Ed.2d 108 (2010) (the "substantive purpose" of the related Mandatory Victims Restitution Act of 1996, § 3664, is "to ensure that victims of a crime receive full restitution"). And the nature of the child pornography industry and the indivisible quality of the injuries suffered by its victims make this a paradigmatic situation in which traditional tort law principles would require joint and several liability. By requiring restitution for the "full amount of the victim's losses," § 2259(b)(1), Congress did not depart from these principles; it embraced them.
*482 First, the injuries caused by child pornography possessors are impossible to apportion in any practical sense. It cannot be said, for example, that Paroline's offense alone required Amy to attend five additional minutes of therapy, or that it caused some discrete portion of her lost income. The majority overlooks this fact, ordering courts to surmise some " circumscribed" amount of loss based on a list of factors. Ante, at 1727, 1727 - 1728; see also ante, at 1733 - 1735 (ROBERTS, C.J., dissenting). Section 2259's full restitution requirement dispenses with this guesswork, however, and in doing so it harmonizes with the settled tort law tradition concerning indivisible injuries. As this Court explained this rule in Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), unless a plaintiff's "injury is divisible and the causation of each part can be separately assigned to each tortfeasor," the rule is that a "tortfeasor is not relieved of liability for the entire harm he caused just because another's negligence was also *1741 a factor in effecting the injury." Id., at 260, n. 8, 99 S.Ct. 2753; see also Prosser and Keeton § 52, at 347 (joint and several liability applies to injuries that "are obviously incapable of any reasonable or practical division"); Feneff v. Boston & Maine R. Co., 196 Mass. 575, 580, 82 N.E. 705, 707 (1907) (similar).
Second, Congress adopted § 2259 against the backdrop of the rule governing concerted action by joint tortfeasors, which specifies that "[w]here two or more [tortfeasors] act in concert, it is well settled ... that each will be liable for the entire result." Prosser and Keeton § 52, at 346. The degree of concerted action required by the rule is not inordinate; "if one person acts to produce injury with full knowledge that others are acting in a similar manner and that his conduct will contribute to produce a single harm, a joint tort has been consummated even when there is no prearranged plan." 1 F. Harper, F. James, & O. Gray, The Law of Torts § 10.1, p. 699 (1st ed. 1956) (hereinafter 1 Harper and James); see also, e.g., Troop v. Dew, 150 Ark. 560, 565, 234 S.W. 992, 994 (1921) (defendants jointly *483 liable for uncoordinated acts where they were "working to a common purpose").
Child pornography possessors are jointly liable under this standard, for they act in concert as part of a global network of possessors, distributors, and producers who pursue the common purpose of trafficking in images of child sexual abuse. As Congress itself recognized, "possessors of such material" are an integral part of the "market for the sexual exploitative use of children." § 2251 Finding (12). Moreover, although possessors like Paroline may not be familiar with every last participant in the market for child sexual abuse images, there is little doubt that they act with knowledge of the inevitable harms caused by their combined conduct. Paroline himself admitted to possessing between 150 and 300 images of minors engaged in sexually explicit conduct, which he downloaded from other offenders on the Internet. See 672 F.Supp.2d 781, 783 ; App. 146. By communally browsing and downloading Internet child pornography, offenders like Paroline "fuel the process" that allows the industry to flourish. O'Connell, Paedophiles Networking on the Internet, in Child Abuse on the Internet: Ending the Silence 77 (C. Arnaldo ed. 2001). Indeed, one expert describes Internet child pornography networks as "an example of a complex criminal conspiracy," ibid. -the quintessential concerted action to which joint and several liability attaches.
Lastly, § 2259's full restitution requirement conforms to what Congress would have understood to be the uniform rule governing joint and several liability for intentional torts. Under that rule, "[e]ach person who commits a tort that requires intent is jointly and severally liable for any indivisible injury legally caused by the tortious conduct." Restatement (Third) of Torts: Apportionment of Liability § 12, p. 110 (2007). There is little doubt that the possession of images of a child being sexually abused would amount to an intentional invasion of privacy tort-and an extreme one at that. See *484 Restatement (Second) of Torts § 652B, p. 378 (1976) ("One who intentionally intrudes, physically or otherwise, upon [another's] private affairs or concerns, is subject to liability ... if the intrusion would be highly offensive to a reasonable person").[4] *1742 Section 2259's imposition of joint and several liability makes particular sense when viewed in light of this intentional tort rule. For at the end of the day, the question of how to allocate losses among defendants is really a choice between placing the risk of loss on the defendants (since one who is caught first may be required to pay more than his fair share) or the victim (since an apportionment regime would risk preventing her from obtaining full recovery). Whatever the merits of placing the risk of loss on a victim in the context of a negligence-based offense, Congress evidently struck the balance quite differently in this context, placing the risk on the morally culpable possessors of child pornography and not their innocent child victims.
C
Notwithstanding § 2259's text and the longstanding tort law traditions that support it, the majority adopts an apportionment approach based on its concern that joint and several liability might lead to unfairness as applied to individual defendants. See ante, at 1724 - 1728. The majority finds this approach necessary because § 2259 does not provide individual defendants with the ability to seek contribution from *485 other offenders. Ante, at 1725 - 1726. I agree that the statute does not create a cause of action for contribution, but unlike the majority I do not think the absence of contribution suggests that Congress intended the phrase "full amount of the victim's losses" to mean something less than that. For instead of expending judicial resources on disputes between intentional tortfeasors, Congress crafted a different mechanism for preventing inequitable treatment of individual defendants-the use of periodic payment schedules.
Section 2259(b)(2) directs that "[a]n order of restitution under this section shall be issued and enforced in accordance with section 3664." Section 3664(f)(1)(A) in turn reiterates § 2259's command that courts "shall order restitution to each victim in the full amount of each victim's losses." But § 3664 goes on to distinguish between the amount of restitution ordered and the schedule on which payments are to be made. Thus, § 3664(f)(2) states that a court "shall ... specify in the restitution order ... the schedule according to whic[h] the restitution is to be paid," and § 3664(f)(3)(A) provides that "[a] restitution order may direct the defendant to make a single, lump sum payment" or "partial payments at specified intervals." Critically, in choosing between lump-sum and partial payments, courts "shall" consider "the financial resources and other assets of the defendant," along with "any financial obligations of the defendant, including obligations to dependents." §§ 3664(f)(2)(A), (C).
Applying these factors to set an appropriate payment schedule in light of any individual child pornography possessor's financial circumstances would not be difficult; indeed, there is already a robust body of case law clarifying how payment schedules are to be set under § 3664(f). For example, Courts of Appeals have uniformly found it an abuse of discretion to require defendants to make immediate lump-sum payments for the full amount of a restitution award when they do not have *1743 the ability to do so. In such cases, Congress has instead required courts to impose periodic payment *486 schedules. See, e.g., United States v. McGlothlin, 249 F.3d 783, 784 (C.A.8 2001) (reversing lump-sum payment order where defendant "had no ability to pay the restitution immediately," and requiring District Court to set a periodic payment schedule); United States v. Myers, 198 F.3d 160, 168-169 (C.A.5 1999) (same). The existing body of law also provides guidance as to proper payment schedules. Compare, e.g., United States v. Calbat, 266 F.3d 358, 366 (C.A.5 2001) (annual payment of $41,000 an abuse of discretion where defendant had a net worth of $6,400 and yearly income of $39,000), with United States v. Harris, 60 F.Supp.2d 169, 180 (S.D.N.Y.1999) (setting payment schedule for the greater of $35 per month or 10% of defendant's gross income).
Section 3664's provision for partial periodic payments thus alleviates any concerns of unfairness for the vast number of child pornography defendants who have modest financial resources. A more difficult challenge is presented, however, by the case of a wealthy defendant who would be able to satisfy a large restitution judgment in an immediate lump-sum payment. But the statute is fully capable of ensuring just results for these defendants, too. For in addition to an offender's financial circumstances, § 3664 permits courts to consider other factors "in the interest of justice" when deciding whether to impose a payment schedule. See § 3664(f)(2) (district court shall specify payment schedule "pursuant to section 3572"); § 3572(d)(1) (restitution order shall be payable in periodic installments if "in the interest of justice").
Accordingly, in the context of a restitution order against a wealthy child pornography possessor, it would likely be in the interest of justice for a district court to set a payment schedule requiring the defendant to pay restitution in amounts equal to the periodic losses that the district court finds will actually be "incurred by the victim," § 2259(b)(3), in the given timeframe. In this case, for example, Amy's expert estimates that she will suffer approximately $3.4 million in losses from medical costs and lost income over the *487 next 60 years of her life, or approximately $56,000 per year. If that estimate is deemed accurate, a court would enter a restitution order against a wealthy defendant for the full $3.4 million amount of Amy's losses, and could make it payable on an annual schedule of $56,000 per year. Doing so would serve the interest of justice because the periodic payment schedule would allow the individual wealthy defendant's ultimate burden to be substantially offset by payments made by other offenders,[5] while the entry of the full restitution award would provide certainty to Amy that she will be made whole for her losses.
Although I ultimately reach a different conclusion as to the proper interpretation *1744 of the statutory scheme, I do appreciate the caution with which the Court has announced its approach. For example, the Court expressly rejects the possibility of district courts entering restitution orders for "token or nominal amount[s]." Ante, at 1727. That point is important because, if taken out of context, aspects of the Court's opinion might be construed otherwise. For instance, the Court states that in estimating a restitution amount, a district court may consider "the broader number of offenders involved (most of whom will, of course, never be caught or convicted)." Ante, at 1728. If that factor is given *488 too much weight, it could lead to exactly the type of trivial restitution awards the Court disclaims. Amy's counsel has noted, for instance, that in light of the large number of persons who possess her images, a truly proportional approach to restitution would lead to an award of just $47 against any individual defendant. Brief for Respondent Amy 65. Congress obviously did not intend that outcome, and the Court wisely refuses to permit it.[6]
In the end, of course, it is Congress that will have the final say. If Congress wishes to recodify its full restitution command, it can do so in language perhaps even more clear than § 2259's "mandatory" directive to order restitution for the "full amount of the victim's losses." Congress might amend the statute, for example, to include the term "aggregate causation." Alternatively, to avoid the uncertainty in the Court's apportionment approach, Congress might wish to enact fixed minimum restitution amounts. See, e.g., § 2255 (statutorily imposed $150,000 minimum civil remedy). In the meanwhile, it is my hope that the Court's approach will not unduly undermine the ability of victims like Amy to recover for-and from-the unfathomable harms they have sustained.

The Fifth Circuit recognized this standard more than 60 years ago when it observed that " '[a]ccording to the great weight of authority where the concurrent or successive acts or omissions of two or more persons, although acting independently of each other, are in combination, the direct or proximate cause of a single injury,' " any of them may be held liable " 'even though his act alone might not have caused the entire injury, or the same damage might have resulted from the act of the other tort-feasor[s].' " Phillips Petroleum Co. v. Hardee, 189 F.2d 205, 212 (1951) (quoting 38 Am.Jur. Negligence § 257, p. 946 (1941) ).

THE CHIEF JUSTICE's dissent elides the distinction between aggregate and but-for causation. Despite "assum[ing], for purposes of argument," that § 2259 incorporates aggregate causation, the dissent nevertheless applies but-for causation to determine the "full amount" of losses Paroline must pay. See ante, at 1718 - 1719, and n. 2 (arguing that Paroline can only be asked to pay "the full amount of the losses he caused," not losses that he and others combined to cause). My dissenting colleagues cannot have it both ways. Either § 2259 incorporates aggregate causation (in which case the full amount of Amy's losses is all of the losses aggregately caused by Paroline and like offenders), or it requires but-for causation (in which case Amy gets nothing).

THE CHIEF JUSTICE objects that gang assaults are not a "fair analogy" because they involve a group of individuals acting "together, with a common plan." Ante, at 1732, n. 3. But individuals need not act together to trigger joint and several liability; such liability applies equally to multiple actors who independently commit intentional torts that combine to produce an indivisible injury. Infra, at 1740 - 1742. And in any event, the offenders at issue in this case do act together, with the common end of trafficking in the market for images of child sexual abuse. See infra, at 1740 - 1741. While these offenders may not be physically in the same room when they commit their crimes, there is no reason to read § 2259(b)(4)'s "mandatory" restitution command out of the statute for child abusers who hide behind the anonymity of a computer screen.

Possession of child pornography under § 2252 constitutes an intentional tort notwithstanding that the offense requires a mens rea of knowledge. See § 2252(a)(3)(B) (punishing one who "knowingly sells or possesses" child pornography). One is "said to act knowingly if he is aware ' "that [a] result is practically certain to follow from his conduct." ' " United States v. Bailey, 444 U.S. 394, 404, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). That definition is, if anything, more exacting than the kind of "intent" required for an intentional tort under the Restatement, which defines "intent" to include situations where an actor "believes that ... consequences are substantially certain to result from [his act]." Restatement (Second) of Torts § 8A, p. 15 (1965).

As the facts of this case show, the offset would be significant. Between June 2009 and December 11, 2013, Amy obtained restitution awards from 182 persons, 161 of whom were ordered to pay an amount between $1,000 and $530,000. See Restitution Awards for Amy Through December 11, 2013, Lodging of United States. If these offenders (and new offenders caught each month) were instead ordered to pay the full amount of restitution in periodic amounts according to their financial means, a wealthy defendant's annual obligation would terminate long before he would be required to pay anything close to the full $3.4 million. For once a victim receives the full amount of restitution, all outstanding obligations expire because § 2259 does not displace the settled joint and several liability rule forbidding double recovery. See Restatement (Second) of Torts § 885(3) (1979), see also, e.g., United States v. Nucci, 364 F.3d 419, 423 (C.A.2 2004).
* * *

The Court mentions that Amy received roughly $6,000 from her uncle, the person responsible for abusing her as a child. Ante, at 1716 - 1717. Care must be taken in considering the amount of the award against Amy's uncle, however, ante, at 1728, because as Amy's expert explained, Amy was "back to normal" by the end of her treatment for the initial offense. App. 70. It was chiefly after discovering, eight years later, that images of her sexual abuse had spread on the Internet that Amy suffered additional losses due to the realization that possessors like Paroline were viewing them and that "the sexual abuse of her has never really ended." Id., at 71.